

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>EFOORA, INC.<br>PARTNERS HOLDING, LLC<br>DAVID S. GROSKY and<br>MELVIN S. DOKICH,<br><br>Defendants, and<br><br>JODI K. GROSKY and<br>LEAH GROSKY,<br><br>Relief Defendants. | C 06CV3526<br>JUDGE HOLDERMAN<br>MAGISTRATE SCHENKIER<br><br>FILED<br>JUN 29 2006 *TG*<br>JUN 29 2006<br>MICHAEL W. DOBBINS<br>CLERK, U.S. DISTRICT COURT |

## COMPLAINT

Plaintiff, Securities and Exchange Commission ("Commission"), for its Complaint against Efoora, Inc., Partners Holding, LLC, David S. Grosky and Melvin S. Dokich (collectively, "Defendants") and Relief Defendants Jodi K. Grosky ("Jodi Grosky") and Leah N. Grosky ("Leah Grosky") (collectively, "Relief Defendants"), alleges as follows:

## SUMMARY

1. The Commission brings this action to enjoin Defendants from engaging in an unregistered and fraudulent offering of Efoora stock. Efoora is in the business of designing, manufacturing and marketing rapid diagnostic tests. From at least January 2000 through April 2006, Efoora raised more than $40 million by selling over 100 million shares of its stock to about

5,000 investors. Efoora, directly and through a network of unregistered brokers or "finders," solicited investors through a series of false and misleading statements about its business, including: (a) the amount of offering proceeds paid to finders; (b) plans to conduct an initial public offering ("IPO"); (c) when the U.S. Food and Drug Administration ("FDA") would approve its products for sale in the United States; and (d) its projected profits. Its offering was not registered under the federal securities laws and did not qualify for any exemption from registration.

2. Grosky, Efoora's former CEO, Dokich, an employee, and Partners Holding, a company controlled by Grosky, participated in the unregistered offering. Until approximately November 2003, Efoora issued and sold its stock directly to the general public. Grosky, Dokich and finders recruited by Grosky solicited those sales on behalf of Efoora. From November 2003 through at least April 2006, Efoora issued stock to Grosky, Dokich and others. Grosky then sold those shares to the general public through Partners Holding or other finders and transferred a portion of the proceeds to Efoora. Partners Holding offered and sold Efoora stock without registering as a broker-dealer.

3. In addition to violating registration requirements, Grosky and Partners Holding committed securities fraud. As Efoora's CEO, Grosky reviewed and approved Efoora's 2002 and 2003 private placement memoranda ("PPMs") even though he knew or was reckless in not knowing that they contained false and misleading statements. Partners Holding, through Grosky and its salespersons, knowingly or recklessly made false and misleading statements to investors and gave them misleading offering documents. Grosky has received approximately $1 million in salary and other payments from Efoora, Partners Holding and directly from investors.

4.      Defendants Efoora, Partners Holding, Grosky and Dokich directly and indirectly engaged in and, unless enjoined, will continue to engage in transactions, acts, practices and courses of business which violate Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and (c)].

5.      Defendants Efoora, Partners Holding and Grosky directly and indirectly engaged in and, unless enjoined, will continue to engage in transactions, acts, practices and courses of business which violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. 240.10b-5].

6.      Defendants Partners Holding and Grosky directly and indirectly engaged in and, unless enjoined, will continue to engage in transactions, acts, practices and courses of business which violate Section 15(a) of the Exchange Act [15 U.S.C. §§ 78o(a)].

7.      The Commission brings this action to enjoin such transactions, acts, practices and courses of business and for other relief pursuant to Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. § 77t(b), (d)], and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. § 78u(d)-(e)].

## JURISDICTION

8.      This court has jurisdiction pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

## DEFENDANTS

9.      Efoora, incorporated in 1994, is a Delaware corporation based in Buffalo Grove, Illinois. It has not registered any class of securities under the Exchange Act and has not registered any offering of securities under the Securities Act.

10. Partners Holding is a Delaware limited liability company formed by Grosky in January 2004 for the purpose of selling Efoora stock.

11. Grosky is 44 years old and resides in Highland Park, Illinois. He became Efoora's CEO and chairman in 1997. He resigned as CEO in mid-2004 and as chairman in early 2005, but continued to sell Efoora stock through Partners Holding.

12. Dokich is 59 years old and resides in Berwyn, Illinois. Dokich has been responsible for Efoora's investor relations from approximately January 2000 to the present.

13. On May 17, 2006, Grosky and Dokich were indicted in a parallel criminal case.

## RELIEF DEFENDANTS

14. Jodi Grosky is David Grosky's wife. Partners Holding transferred about $160,000 to a bank account in Jodi Grosky's name from June 30, 2005 to December 30, 2005. Jodi Grosky profited in that amount and has no legitimate claim to those proceeds.

15. Leah Grosky is David Grosky's mother and resides in Morton Grove, Illinois. Jodi Grosky transferred about $40,000 from her bank account to a brokerage account in Leah Grosky's name on July 29, 2005. Leah Grosky profited in that amount and has no legitimate claim to those proceeds.

## FACTS

### Background

16. Efoora and its two subsidiaries, Virotek, LLC and Prion Developmental Laboratories, Inc., design, manufacture and market rapid diagnostic tests. Their main products include a HIV Rapid Test ("HIV Test"), a blood glucose test for diabetics ("Glucose Test"), and a rapid test for Bovine Spongiform Encephalopathy in cattle, known commonly as Mad Cow Disease ("Mad Cow Test").

17. The HIV Test and Glucose Test require FDA approval before they can be sold commercially in the U.S.

18. Efoora completed clinical trials for its HIV Test in early 2003 and submitted an application to obtain FDA approval in or about September 2003. However, Efoora has not been able to obtain FDA approval.

19. On August 25, 2005, the FDA sent a warning letter to Efoora citing numerous problems with its clinical trials. The letter stated, among other things, that the FDA's inspection of two clinical trial sites disclosed violations "so numerous and pervasive that they demonstrate [Efoora] failed to properly monitor the study."

20. On March 1, 2006, the FDA informed Efoora that its application for its HIV Test was "not approvable." The letter cited the previously identified deficiencies with Efoora's clinical trials and other problems with the test itself.

21. Efoora has not conducted clinical trials or submitted an application to the FDA to obtain approval for its Glucose Test.

22. The Mad Cow Test requires approval from the U.S. Department of Agriculture ("USDA") before it can be sold commercially in the U.S.

23. Efoora submitted an application to obtain USDA approval in or about April 2006. It previously received USDA approval for a rapid test for chronic wasting disease in deer and elk, a condition similar to Mad Cow Disease, but has not been successful in marketing or selling that test commercially.

### The Efoora Offering

24. From at least January 2000 through April 2006, Efoora raised over $40 million from about 5,000 investors across the U.S. and in foreign countries by continuously selling over 100 million shares of its stock.

25. Until approximately November 2003, Efoora issued and sold its stock directly to the general public. Grosky, Dokich and a network of finders recruited by Grosky solicited those sales on behalf of Efoora. From November 2003 through at least April 2006, Efoora issued stock to Grosky, Dokich and others. Grosky then sold those shares to the general public through Partners Holding or other finders and transferred a portion of the proceeds to Efoora.

26. Efoora prepared and distributed to investors various offering documents, including two PPMs. The first PPM, dated March 15, 2002, was for a purported offering of $5 million ("2002 PPM"). The second PPM, dated February 21, 2003, was for a purported offering of $25 million ("2003 PPM"). Both PPMs claimed that the offering was exempt from registration pursuant to, among other provisions, Section 4(2) of the Securities Act.

27. In January 2002, Efoora filed a Form D with the Commission stating that it intended to raise up to $5 million through a private placement of its common stock purportedly exempt from registration under Rule 506 of Regulation D. It did not file any other Forms D for an offering of common stock.

28. Efoora did not adhere to the terms of its offering documents in that, among other things, it did not restrict its offering to a limited number of accredited investors or sell its stock on the terms specified in its PPMs. The PPMs stated that Efoora was offering units consisting of blocks of its stock for $2.50 and $4.00 per share, respectively. In reality, Efoora has continuously offered and sold various numbers of shares to investors at widely varying prices.

Grosky sold or authorized the sale of stock at prices that varied from $.08 per share to as high as $4.00 per share.

29. The offering did not qualify for any exemption from registration because, among other things, Efoora and its finders cold-called investors with no prior relationship to Efoora across the U.S., distributed misleading offering documents to investors, and did not limit the offering to qualified investors.

### Efoora's Misleading Offering Documents

30. Efoora's 2002 PPM, which was distributed to investors during at least 2002, contained material misrepresentations, including that: (a) Efoora will pay finders a 10% commission and a 2% non-accountable expense allowance; (b) Efoora will conduct a "highly anticipated IPO in 2003"; (c) Efoora "expected FDA clearance to market the Efoora HIV Rapid Test in the U.S. by the first quarter of 2003"; (d) "Profitability is projected to be achieved in 2002, increasing sharply thereafter as more products and profit centers are brought online"; and (e) Efoora estimated revenues of $276 million by 2006, including $76 million from sales of its HIV Test and $109 million from sales of the its Glucose Test.

31. Each of Efoora's 2002 PPM representations was false and misleading. In fact, Efoora paid finders significantly more than a 10% commission and a 2% expense allowance; Efoora had taken virtually no steps toward conducting an IPO and did not go public in 2003; Efoora had not completed clinical trials for its HIV Test, had no basis for projecting FDA approval and did not obtain approval in 2003; and, as a start-up company with no products approved by the FDA, Efoora had no basis for its projected revenue and profitability.

32. Efoora's 2003 PPM, which was distributed to investors during at least 2003, contained similar material misrepresentations, including that (a) Efoora will pay finders a 10%

commission and a 2% non-accountable expense allowance; (b) Efoora will conduct a "highly anticipated IPO in late 2003 or early 2004" and will "begin publicly trading its common stock on the NASDAQ Stock Market after an Initial Public Offering"; (c) Efoora "expected FDA clearance to market the Efoora HIV Rapid Test in the U.S. in 2003"; (d) A "big five" accounting firm projected the net present value of Efoora's Glucose Test "to a major biotech company already in the [glucose test] business . . . . over a ten-year period would approach $1 billion"; (e) "The company will have its first profitable year in 2003, increasing sharply thereafter as more products and profit centers are brought online"; and (f) Efoora estimated future revenues of $677 million by 2007, including $55 million from sales of its HIV Test and $562 million from sales of its Glucose Test.

33. Each of Efoora's 2003 PPM representations was false and misleading. In fact, Efoora paid finders significantly more than a 10% commission and a 2% expense allowance; Efoora still had taken virtually no steps toward conducting an IPO and did not go public in late 2003 or early 2004; Efoora had just completed clinical trials for its HIV Test, had no basis for projecting FDA approval and did not obtain approval in 2003; the "big five" accounting firm did not give Efoora a final report because Efoora did not pay its fee and specifically told Grosky that its work product was not for distribution to potential investors; and Efoora, as a start-up company that still had not generated a material amount of revenues and still had no products approved by the FDA, had no basis for its projected revenue.

34. Investors who purchased Efoora stock from Partners Holding within the last six months did not receive a PPM. Instead, they received, among other offering documents, a synopsis and executive summary of Efoora's business. Efoora's management drafted the executive summary in or about mid-2005. It contained detailed information about Efoora's

- 8 -

products such as a discussion of its HIV Test clinical studies and a comparison of its test to other rapid HIV tests. It also contained an analysis of Efoora's potential share price in comparison to other public companies with approved HIV or glucose tests. It did not contain any information about the impact of the FDA warning letter or not approvable letter on Efoora's prospects. In fact, the synopsis continued to state that Efoora expected to receive FDA approval for its HIV Test in 2005.

35. Grosky, who was no longer an officer or director of Efoora, received a copy of the executive summary. Efoora management told him that the executive summary was not for distribution to individual investors, but thereafter Partners Holding began using it to solicit investors.

### Grosky's and Partners Holding's Roles in the Fraud

36. As Efoora's CEO or chairman until early 2005, Grosky was in charge of raising money for Efoora. He reviewed and approved Efoora's 2002 and 2003 PPMs even though he knew or was reckless in not knowing that they contained false and misleading statements.

37. Grosky controls Partners Holding. He gave Partners Holding's salespersons Efoora's executive summary even though Efoora management told him that it was not for distribution to individual investors. Grosky and Partners Holding's salespersons knew or were reckless in not knowing that the executive summary was false and misleading because it did not include information about the impact of the FDA warning letter and the not approvable letter on Efoora's business prospects. Grosky knew that Partners Holding salespersons distributed the executive summary to investors.

38. Partners Holding salespersons also made materially misleading statements and omitted material information in soliciting Efoora investors.

39. One Partners Holding salesperson, who identified himself as "Senior Account Executive, Partners Holding, LLC," cold-called an 81 year old resident of Massachusetts in January of 2006 and told the investor that Efoora "was a good stock," had developed a HIV Test and "would be worth a lot more in a year or two," even though Efoora had received the FDA warning letter and still had not recorded a profit. The investor bought 5,000 shares for $1 per share and sent his check and subscription agreement to Efoora.

40. Another Partners Holding salesperson, who identified himself as "Investor Relations, Partners Holding, LLC," cold-called a 77 year old resident of Bonita, California in March of 2006. He told the investor that "we have a winner here," that Efoora had developed a rapid HIV test with 99% accuracy that could be administered at home, and that FDA approval was "imminent," even though Efoora had the FDA warning letter and not approvable letter and still had not recorded a profit. The investor bought 5,000 shares for $1 per share and sent his check and subscription agreement to Dokich at Efoora.

41. Another salesperson, purportedly working on behalf of Partners Holding, contacted an existing investor in March 2006 to solicit an additional purchase of stock. He represented without any basis that Efoora was making progress, that he thought Efoora would go public in the first part of 2007, and that Virgin Atlantic Airways Ltd. donated a plane to Efoora for marking its HIV Test in foreign countries. The investor bought 100,000 shares of Efoora stock at $.08 per share for a total additional investment of $8,000. The investor wired his payment to a Partners Holding bank account.

42. Partners Holding is not registered with the Commission as a broker or dealer. From at least January 2004 through April 2006, it has continuously solicited and sold Efoora stock to investors, negotiated securities transactions between Efoora and investors, gave

investors advice on the merits of the investment in Efoora and received commissions for its sales efforts. Partners Holding has received about $6.9 million from investors. It transferred approximately $3.9 million to Efoora and retained about $3.0 million for the benefit of Grosky and its salespersons.

43. Grosky has received approximately $1 million in payments from Efoora, Partners Holding and directly from investors.

### Efoora's Financial Problems

44. Although Efoora raised about $40 million from investors, it has not obtained FDA or USDA approval for any of its main products. It has not been able to generate a material amount of revenues, has never earned a profit and currently owes about $500,000 in past due rent for its facility in Buffalo Grove.

## COUNT I

### Violations of Section 5(a) and 5(c) of the Securities Act

45. Paragraphs 1 through 44 are realleged and incorporated by reference as though fully set forth herein.

46. Defendants Efoora, Partners Holding, Grosky and Dokich directly and indirectly (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities through the use or medium of a prospectus or otherwise or carried or caused to be carried through the mails or in interstate commerce by the means or instruments of transportation, such securities for the purpose of sale or for delivery after sale; and (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of

any prospectus or otherwise, securities without a registration statement having been filed as to such securities.

47. Efoora's offering was not registered with the Commission or subject to an exemption from the registration requirements of the federal securities laws.

48. By reason of the foregoing Defendants Efoora, Partners Holding, Grosky and Dokich have violated and, unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§77e(a) and 77c(c)].

## COUNT II

### Violations of Section 17(a)(1) of the Securities Act

49. Paragraphs 1 through 44 are realleged and incorporated by reference as though fully set forth herein.

50. Defendants Efoora, Partners Holding and Grosky in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have employed devices, schemes and artifices to defraud.

51. By reason of the foregoing, Efoora, Partners Holding and Grosky have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT III

### Violations of Sections 17(a)(2) and (3) of the Securities Act

52. Paragraphs 1 through 44 are realleged and incorporated by reference as though fully set forth herein.

53. Defendants Efoora Partners Holding and Grosky, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have:

    A.    obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    B.    engaged in transactions, practices or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

54. Efoora, Partners Holding and Grosky knew or were reckless in not knowing of the facts and circumstances described above.

55. By reason of the foregoing, Efoora, Partners Holding and Grosky have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and (3)].

## COUNT IV

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

56. Paragraphs 1 through 44 are realleged and incorporated by reference as though fully set forth herein.

57. Defendants Efoora, Partners Holding and Grosky, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly: used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made,

not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and sellers and prospective purchasers and sellers of securities.

58. Efoora, Partners Holding and Grosky knew or were reckless in not knowing the facts and circumstances described above.

59. By reason of the foregoing, Efoora, Partners Holding and Grosky violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## COUNT V

### Violations of Section 15(a) of the Exchange Act

60. Paragraphs 1 through 44 are realleged and incorporated by reference as though fully set forth herein.

61. Partners Holding directly or indirectly, by use of the mails or the means or instrumentalities of interstate commerce, while acting as a broker or a dealer, effected transactions in, and induced or attempted to induce the purchase or sale of Efoora securities without registering as a broker in accordance with Section 15(b) of the Exchange Act [15 U.S.C. § 77o(b)].

62. By reason of the foregoing, Partners Holding violated and, unless enjoined, will continue to violate Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## COUNT VI

### Aiding and Abetting Violations of Section 15(a) of the Exchange Act

63. Paragraphs 1 through 44 are realleged and incorporated by reference as though fully set forth herein.

64. As set forth more fully above, Partners Holding violated Section 15(a) of the Exchange Act by directly or indirectly, by use of the mails or the means or instrumentalities of interstate commerce, while acting as a broker or a dealer, effected transactions in, and induced or attempted to induce the purchase or sale of Efoora securities without registering as a broker in accordance with Section 15(b) of the Exchange Act.

65. Grosky knowingly and substantially aided and abetted Partners Holding's violations and, unless enjoined, will continue to aid and abet or violate Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## **RELIEF REQUESTED**

**THEREFORE,** the Commission requests that the Court:

A. Find that Defendants committed the violations alleged above.

B. Enter an order temporarily and/or preliminarily enjoining Efoora, Partners Holding, Grosky and Dokich from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§77e(a) and (c)]; Partners Holding from violating Sections 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1)-(3)], Sections 10(b) and 15(a) of the Exchange Act (15 U.S.C. § 78j(b), §78o(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. 240.10b-5]; and Grosky from aiding and abetting violations of Section 15(a) of the Exchange Act.

C. Enter an order permanently enjoining Efoora, Partners Holding, Grosky and Dokich from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§77e(a) and (c)]; Efoora, Partners Holding and Grosky from violating Sections 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1)-(3)], Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. 240.10b-5]; Partners Holding from

violating Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)]; and Grosky from aiding and abetting violations of Section 15(a) of the Exchange Act.

D.  Enter an order requiring Defendants Efoora, Partners Holding, Grosky and Dokich to disgorge the ill-gotten gains that they received as a result of their wrongful conduct, including prejudgment interest.

E.  Enter an order requiring Relief Defendants Jodi Grosky and Leah Grosky to disgorge the ill-gotten gains that they received as a result of the Defendants' wrongful conduct, including prejudgment interest.

F.  Enter an order imposing upon Efoora, Partners Holding, Grosky and Dokich appropriate civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 20(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

G.  Enter orders granting additional relief, including:

   1. A freeze on the assets of Partners Holding and Grosky; the intellectual property of Efoora, and certain assets of Jodi Grosky and Leah Grosky;

   2. An order prohibiting destruction of documents;

   3. An accounting from Efoora and Partners Holding;

   4. Expedited discovery.

H.  Retain jurisdiction of this action in accordance with the principals of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

I. Grant orders for such further relief as the Court deems appropriate.

Respectfully submitted,

*[signature]*

Jerrold H. Kohn, Illinois Bar No. 6188085
Thomas J. Meier, Illinois Bar No. 6225621
Paul A. Montoya, Illinois Bar No. 6229890

Attorneys for Plaintiff
Securities and Exchange Commission
175 W. Jackson Boulevard
Suite 900
Chicago, Illinois 60604-2615
(312) 353-7390

Dated: June 29, 2006